Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Priscilla D. Kam, Esq.
Joshua D. Smith, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                          Docket No.: _____(     )

                                        Plaintiffs,

        -against-


HEALTH AND COMFORT RX INC.,
GAVRIEL AKILOV, AND
BORIS MOSHEYEV,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## **COMPLAINT**

        Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Health and Comfort Rx Inc., Gavriel

Akilov, and Boris Mosheyev (collectively, "Defendants"), hereby allege as follows:

1.    This action seeks to terminate an egregious fraudulent scheme perpetrated against GEICO by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $2,885,000.00 in fraudulent pharmaceutical billing to GEICO.  Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent charges (using the United States mail) seeking payment for a set of specifically targeted, medically unnecessary "pain relieving" topical prescription drug products, including topical compounded pain creams and topical pain gels, lotions, ointments, and pain patches (collectively, the "Fraudulent Topical Pain Products"), as well as various other prescription drug medications (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.    Defendants Health and Comfort Rx Inc. ("HC RX") and its owners, Gavriel Akilov ("Akilov") and Boris Mosheyev ("Mosheyev"), dispensed the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").  In order to exploit the Insureds for financial gain, the Defendants targeted the prescription and dispensing of the Fraudulent Topical Pain Products in place of other effective, but much-less costly prescription and non-prescription drug products because the Defendants were able to acquire – or with respect to compounded pain creams, manufacture – the Fraudulent Topical Pain Products at low cost and then dispense and bill for them at egregious prices.

3.    As an essential part of the fraudulent scheme, Defendants entered into illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers") and persons who work at or are associated with various multidisciplinary medical clinics (the "Clinic Controllers") that almost exclusively treat No-Fault patients ("No-Fault Clinics"), and

caused them to steer large volumes of prescriptions to HC RX for the Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals, in exchange for kickbacks.

4.     The Defendants' scheme initially centered around HC RX's production and dispensing of large volumes of topical compounded pain creams in set formulations (the "Fraudulent Compounded Pain Creams"), which were not approved by the United States Food and Drug Administration ("FDA"), and which were dispensed without complying with state and federal licensing requirements. The Defendants' billing for the Fraudulent Compounded Pain Creams typically ranged from $962.50 to $2,280.82 for a single tube, though charges at times exceeded $4,500.00. Thereafter, the Defendants billed for specifically targeted Fraudulent Topical Pain Products in the form of topical Diclofenac Gel 3%, Lidocaine 5% Ointment, and various topical pain patches (the "Non-Compounded Fraudulent Topical Pain Products"), with HC RX typically billing various amounts between $1,179.46 and $2,640.00 for each of these prescriptions depending on the product dispensed.

5.     By this action, GEICO seeks to recover more than $385,400.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated reimburse HC RX for over $1,364,000.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through HC RX because:

(i)     HC RX billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

(ii)     The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to HC RX in exchange for unlawful kickbacks and other financial incentives;

(iii)     the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at

low cost and, through HC RX, dispensed in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals;

(iv)    the Defendants engaged in illegal bulk compounding by having HC RX specialize in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; and

(v)    the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of HC RX pursuant to illegal, invalid, duplicitous, and formulaic prescriptions.

6.    The Defendants fall into the following categories:

(i)    HC RX is a New York corporation engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals pursuant to illegal, collusive agreements and predetermined protocols, without regard to genuine patient care, in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault benefits to which it is not entitled; and

(ii)    Akilov and Mosheyev are the record owners of HC RX.

7.    The Defendants' scheme began in 2015 and continues uninterrupted to the present day as the Defendants continue to seek collection on the fraudulent billing.

8.    As discussed more fully below, the Defendants at all times have known that: (i) HC RX billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to HC RX in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and, through HC RX, dispensed in large volumes to Insureds at egregious charges, in place of

4

other effective, less costly pharmaceuticals; (iv) the Defendants engaged in illegal bulk compounding by having HC RX specialize in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; and (v) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of HC RX pursuant to illegal, invalid, duplicitous, and formulaic prescriptions.

9.      Based on the foregoing, HC RX does not have – and never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail. As a result of the Defendants' scheme, GEICO has incurred damages of approximately $385,400.00.

## THE PARTIES

### I.      Plaintiffs

10.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

11.      Defendant HC RX is a New York corporation, incorporated on or about June 4, 2015, with its principal place of business at 147-16 Jamaica Avenue, Jamaica, New York.

12. HC RX knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

13. HC RX engaged in bulk drug compounding activities and specialized in producing and dispensing compounded pain creams.

14. HC RX is registered with New York State as a pharmacy but is not registered as a manufacturer or outsourcing facility.

15. HC RX is not permitted to engage in bulk drug compounding or to specialize in dispensing large quantities of compounded pain creams that are not specifically tailored to the unique needs of individual patients.

16. Defendant Akilov resides in and is a citizen of New York. Akilov, along with Mosheyev, is the owner of HC RX.

17. Defendant Mosheyev resides in and is a citizen of New York. Mosheyev, along with Akilov, is the owner of HC RX.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

20. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of New York's No-Fault Laws

22.     GEICO underwrites automobile insurance in the State of New York.

23.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

24.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

25.     The No-Fault Laws limits reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without prescription are not covered expenses under the No-Fault Laws.

26.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative,

healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

27.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

28.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

29.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

30.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     An Overview of Applicable Licensing Requirements

31.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons

for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

32.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

33.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

34.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

35.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

36.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

37.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

38.    New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on a patient by promoting the sale of drugs to exploit the patient for the financial gain of the licensee or of a third party.

39.    New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

40.    New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

41.    New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of coded or specially marked prescriptions, while New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of secret formula ("coded") prescriptions.

III.    **An Overview of Compounded Drug Products**

42.    The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the United States Food and Drug Administration ("FDA") to oversee the safety of food, drugs, and cosmetics.

43.    The FDA strictly regulates over-the-counter and prescription drugs and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

44.     FDA-approved drugs require: (i) approval prior to marketing; (ii) compliance with federal labelling laws; and (iii) that the drugs be made and tested in accordance with good manufacturing practice regulations (GMPs), which are federal statutes that govern the production and testing of pharmaceutical products.

45.     Compounded drugs are not FDA-approved, though they may include FDA-approved drugs, and are generally exempt from the FDA approval process which applies to new drugs -- but only under limited circumstances.  See 21 U.S.C. § 353a.

46.     In particular, pursuant to Section 503A of the Federal Food, Drug and Cosmetic Act ("FDCA"), as amended by the Compounding Quality Act, the laws applicable to drugs regulated by the FDA, including the laws relating to the safe manufacturing of drugs, generally do not apply to a "compounded" drug product: (1) if the drug product is compounded for an identified individual patient based on the receipt of a valid prescription order that a compounded product is necessary for the identified patient, and (2) if the compounding is performed by a licensed pharmacist in a state licensed pharmacy.

47.     Unlike FDA-approved products, consumers and prescribers cannot assume that compounded drugs were made by validated processes in properly calibrated and cleaned equipment; that the ingredients in the drug were obtained from FDA-approved sources; that production personnel had the requisite knowledge and training; and that appropriate laboratory testing was performed to verify the compounded drug's potency, purity, and quality.

48.     The FDA has publicly expressed concern regarding large-scale drug manufacturing under the guise of traditional small-scale pharmacy compounding.  For example, the FDA has noted that poor practices on the part of bulk drug compounders can result in contamination or products that do not possess the strength, quality, and purity required. Published reports also

consistently show that compounded drugs fail to meet specifications at a considerably higher rate than FDA-approved drugs.

49.     Traditional pharmacy compounding by state licensed pharmacies, therefore, is permissible when done on a small scale by pharmacists who prepare the medication based on an individual prescription.

50.     When Congress adopted 21 U.S.C. § 353a, its express intent was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding." H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.) (emphasis added).  As Congress stated at the time:

> "The exemptions in [this section] are limited to compounding for an *individual patient based on the medical need of such patient for the particular drug compound*. To qualify for the exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate. Although recording the medical need directly on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product. This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons. The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient."

S. Rep. No. 105-43, at 67-68 (1997) (emphasis added).

51.     The prescription of compounded drug products and ensuing billing to both private and public insurers has been the subject of state and federal investigations, litigation, and reports due to increased concerns regarding fraud.

52.     The U.S. Department of Health & Human Services and the U.S. Postal Service have both issued reports documenting fraud concerns with compounded drugs. See High Part D Spending on Opioids and Substantial Growth in Compound Drugs Raise Concerns, HHS OIG Data

Brief, OEI-16-00290 (June 2016); Worker's Compensation Compound Drug Costs, Management Advisory, Report No. HR-MA-16-003 (March 14, 2016).  Most recently, the U.S. Department of Health issued a report which noted that many pharmacies in New York State are among the most questionable in the nation.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

53.    Further, there have been numerous criminal proceedings commenced in connection with compounded drug products.  For example:

- in January 2014, the United States Attorney for the District of New Jersey obtained a guilty plea from a pharmacist involved in the payment of kickbacks to a physician in exchange for prescriptions for compounded pain creams.  See USA v. Kleyman, 1:14-CR-598-JHR, Docket No. 1;

- in February 2016, the United States Attorney for the Northern District of Texas indicted two laypersons who conspired with physicians and pharmacies in a scheme involving producing, prescribing, and distributing compounded creams, including payment of kickbacks to prescribing physicians and insured beneficiaries. See USA v. Cesario, 3:16-CR-060-M, Docket Nos. 3, 75;

- in June 2016, the United States Attorney for the Middle District of Florida indicted a physician for a fraudulent scheme involving payment of kickbacks for the referral of patients and prescriptions for compounded creams. See USA v. Baldizzi, 8:16-CR-271-MSS-AEP, Docket No. 1;

- in August 2016, the United States Attorney for the Southern District of New York indicted members of the Genovese, Gambino, Luchese, and Bonanno crime families, whose alleged illegal activities included "causing…corrupt doctors to issue unnecessary and excessive prescriptions for expensive compound creams" billed to insurers.  See USA v. Parrello, 16 Crim. 522 (2016); and

- in 2020, the United States Attorney for the Central District of California indicted three laypersons and one physician for their involvement in a $22 million fraudulent scheme in which they paid kickbacks in exchange for large volumes of fraudulently generated prescriptions for compounded pain creams. See USA v. Bell, 8:20-CR-00018-JVS, Docket No. 1.

## IV.    The Defendants' Scheme Involving the Fraudulent Pharmaceuticals

### A.    Overview of the Scheme

54.    Beginning in 2015, and continuing uninterrupted through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they used HC RX to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges relating to the Fraudulent Pharmaceuticals purportedly provided to Insureds.

55.    HC RX purports to be a storefront neighborhood pharmacy operating in Jamaica, Queens, New York but instead operates as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally ignoring a vast array of prescription and over-the-counter medications readily available at a fraction of the cost.

56.    Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, HC RX's business is largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

57.    HC RX's charges for the Fraudulent Topical Pain Products have amounted to more than 90% of the claims that Defendants submitted to GEICO for reimbursement, and have resulted in billing to GEICO alone of over $2,646,000.00.

58.    In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and the Clinic Controllers and steered them to prescribe and direct large volumes of prescriptions to HC RX for the targeted set of Fraudulent Topical Pain Products, purportedly to treat patients at various No-Fault Clinics.

59. HC RX, in exchange for the payment of kickbacks, received medically unnecessary prescriptions from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

60. From December 2015 through December 2017, the Defendants' scheme primarily centered around HC RX's mass production and dispensing of topical compounded pain creams in set formulations (i.e., the Fraudulent Compounded Pain Creams), billing more than $1,025,000.00 for these compounded drug products.

61. HC RX submitted voluminous billing for the Fraudulent Compounded Pain Creams, which were not approved by the FDA, without tailoring the medications to the individual needs of any individual patient and without complying with state and federal licensing requirements designed to ensure the quality, safety, and effectiveness of mass produced drug products.

62. HC RX in fact produced the Fraudulent Compounded Pain Creams in bulk by assembling combinations of multiple drug ingredients with unproven effects in order to create exorbitantly-priced products to financially enrich themselves rather than to treat or otherwise benefit the Insureds who purportedly received them. The more ingredients the Defendants included in a Fraudulent Compounded Pain Cream, the more they could inflate the charges they could submit to GEICO and other insurers as compounded drug products are billed per ingredient.

63. The scheme by the Defendants to routinely manufacture and dispense large volumes of the Fraudulent Compounded Pain Creams pursuant to their collusive arrangements with the Prescribing Providers and Clinic Controllers egregiously inflated the charges submitted to GEICO. For example, billing from the Defendants typically ranged from $962.50 to $2,280.82

for a single tube of a Fraudulent Compounded Pain Cream, though charges for a single tube at times exceeded $4,500.00.

64.    In December 2017, the Defendants abruptly ceased manufacturing, dispensing and billing for Fraudulent Compounded Pain Creams through HC RX – likely due to increased scrutiny and litigation against pharmacies by federally funded healthcare programs (i.e., Medicaid and Medicare) and private insurers seeking to combat pervasive insurance fraud based on the fraudulent prescription, dispensing, and billing practices associated with compounded drugs.

65.    Contemporaneously with Defendants' cessation of their fraudulent compounding operation, they drastically increased the billing they submitted through HC RX for other specifically targeted Fraudulent Topical Pain Products, primarily in the form of topical Diclofenac Gel 3%, Lidocaine 5% Ointment, and various topical pain patches (i.e., the Non-Compounded Fraudulent Topical Pain Products). The Defendants commenced billing for these specifically targeted products because they could acquire them at low cost and dispense and bill for them at egregious prices.

66.    As with the Fraudulent Compounded Pain Creams, the Defendants' scheme to steer the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to HC RX for large volumes of the Non-Compounded Fraudulent Topical Pain Products also egregiously inflated the charges submitted to GEICO.  For example, HC RX typically billed between $1,179.46 and $2,358.92 for a single tube of Diclofenac Gel 3%, and $1,523.72 for a single tube of Lidocaine 5% Ointment. Similarly, HC RX dispensed and billed for various topical pain patches, such as Medi-Patches with 5% Lidocaine at an average charge of $2,640.00 per prescription and Terocin 4% Patches at an average charge of $1,350.00 per prescription.

67.    In furtherance of the scheme, and in keeping with the fact that the Fraudulent Pharmaceuticals dispensed by HC RX were prescribed pursuant to collusive kickback arrangements and predetermined protocols rather than genuine patient care, the Defendants created and provided certain Prescribing Providers with preset labels or rubber stamps.

68.    These labels and stamps contained the names of the Fraudulent Topical Pain Products, including the "coded names" of various Fraudulent Compounded Pain Creams along with their ingredient and quantity formulations.  The Prescribing Providers then used the preset labels or stamps on their official New York State prescription pads to prescribe the Fraudulent Topical Pain Products, including the Fraudulent Compounded Pain Creams, to Insureds.

69.    The Defendants provided certain Prescribing Providers and Clinic Controllers with the preset stamps and labels in order to steer the Prescribing Providers and Clinic Controllers to issue as many prescriptions as possible for the Fraudulent Topical Pain Products and direct those prescriptions to HC RX, in exchange for kickbacks and other financial incentives.

70.    HC RX used the illegal, invalid, and fraudulent prescriptions to bill GEICO and other insurers millions of dollars for the Fraudulent Topical Pain Products.

71.    A representative sample of the prescriptions issued by the Prescribing Providers using labels or rubber stamps, which HC RX submitted to GEICO in support of its fraudulent billing, is annexed hereto as Exhibit "2".

72.    Many of the No-Fault Clinics where the prescriptions originated present themselves to be legitimate healthcare practices when, in fact, they are medical mills that house a "revolving door" of numerous healthcare providers that subject Insureds to as many healthcare good and services as possible in order to exploit their No-Fault Benefits by submitting large volumes of fraudulent claims to No-Fault insurers such as GEICO.

73.    In keeping with the fact that Defendants illegally steered the Prescribing Providers and the Clinic Controllers at the No Fault Clinics to provide HC RX with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were never given the option to use a pharmacy of their choosing.

74.    Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to HC RX, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

75.    In fact, less than 8% of Insureds who received prescriptions from HC RX resided in Jamaica – the Queens County neighborhood where HC RX is located, while less than 31% of Insureds resided anywhere Queens County.

76.    Upon information and belief, in most cases, HC RX either purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes or the Fraudulent Pharmaceuticals were given to Insureds by the front desk staff at the various No-Fault Clinics without the Insured ever seeing the prescription.

77.    In some cases, the Insureds were not even aware that a Fraudulent Pharmaceutical dispensed by HC RX was prescribed to them until the medication was delivered to them or distributed to them by the front desk staff.

78.    The Defendants spearheaded their pharmaceutical fraud scheme involving the Prescribing Providers and the Clinic Controllers knowing that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from HC RX to insurers

and financially enrich the Defendants; (iii) the Defendants intentionally targeted a specific set of Fraudulent Topical Pain Products, including the Fraudulent Compounded Pain Creams, that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost; and (v) the Fraudulent Compounded Pain Creams were never prescribed properly in accordance with the governing state and federal regulations, were prescribed and dispensed without regard to genuine patient care or the availability of a wide range of commercially available, FDA-approved medications proven to have therapeutic effects and available at a fraction of the cost, and were prescribed and dispensed despite the fact that they have no proven efficacy and were often duplicative of other medications contemporaneously prescribed to the Insureds.

### B.     The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care to Exploit Patients for Financial Gain

79.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, the Insureds treated by the Prescribing Providers at No-Fault Clinics associated with Clinic Controllers – and who received pharmaceuticals from HC RX – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence- based medical practices with the goal of the Insureds' timely return to good health.

80.     Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an NSAID for the initial management of pain. NSAIDs are the most commonly prescribed analgesic medications

worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

81.     Clinical studies of FDA-approved topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries) in superficial locations.

82.     More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an *individualized, multimodal approach which may include prescription medications depending on various biological, psychological and social factors of an individual patient*, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

83.     Despite these guidelines and the basic goal of helping patients get better in a timely fashion, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the healthcare providers at the No-Fault Clinics purported to render to Insureds as part of a predetermined protocol that failed to include any individualized treatment whatsoever.  These

healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Topical Pain Products dispensed.

84.    To the extent any examination was performed at all, the Prescribing Providers often failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals. Alternatively, the Prescribing Providers inaccurately documented the patients' medical histories, including any current medications the patients were taking at the time of the examination.

85.    Prescribing a multitude of pharmaceutical drug products without first taking a detailed, and accurate, patient history demonstrates a gross indifference to patient health and safety as the Prescribing Providers often do not know whether the patient is currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

86.    The Prescribing Providers also did not document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product.

87.    The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to patients and dispensed by HC RX were actually used by the patients.

88.    The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals provided any pain relief to the patients or were otherwise effective for the purpose prescribed.

89.    At times, the Prescribing Providers failed to document in any of their examination reports that the patient even received a Fraudulent Pharmaceutical.

90.     At times, the Prescribing Providers documented a different Fraudulent Pharmaceutical than that which was actually prescribed and dispensed to the patient.

91.     The Prescribing Providers' failure to properly document which Fraudulent Pharmaceuticals were prescribed to their patients and the patients' reactions to those pharmaceuticals demonstrates a complete disregard for patient health and safety.

92.     In addition, the Prescribing Providers often recommended Insureds continue taking oral NSAIDs (e.g., ibuprofen and naproxen) and/or prescribed oral NSAIDs contemporaneous to prescribing Fraudulent Compounded Pain Creams or Non-Compounded Pain Creams containing NSAIDS, which is known as therapeutic duplication. Therapeutic duplication can cause adverse events to the patient and very often leads to emergency room visits because the use of more than one medication in the same class of drugs exacerbates the possible adverse side effects.

93.     Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

94.     In keeping with the fact that the Fraudulent Pharmaceuticals dispensed by HC RX were prescribed, dispensed, and billed pursuant to fraudulent, predetermined protocols and collusive arrangements with the Prescribing Providers and Clinic Controllers, at the detriment of patient health and safety, at times the Prescribing Providers issued multiple prescriptions for the same Fraudulent Pharmaceuticals, on the same date to the same patient.

95.     Pursuant to the collusive arrangements with the Defendants, the multiple, duplicate prescriptions for the same Fraudulent Pharmaceuticals were steered to HC RX, as well other pharmacies, to support the fraudulent billing submitted by them.

96.     At other times, the same exact prescription was steered to multiple pharmacies or used by HC RX in order to support the fraudulent billing submitted by them.  For example:

- Insured A.D. was allegedly involved in a motor vehicle accident on May 21, 2016. He sought treatment at a No-Fault clinic located at 1220 East New York Avenue, Brooklyn, NY. On May 25, 2016, he underwent an initial examination with Harold James, M.D. ("Dr. James") of Life Circles Healthcare Medical, P.C. ("Life Circles"). Dr. James did not recommend the Insured receive any prescription medications at the time of his initial examination.  Nevertheless, on May 27, 2016, Health Choice Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. James on May 25, 2016. This prescription did not include refills.  On June 13, 2016, pursuant to a **duplicate prescription** issued by Dr. James on May 25, 2016, HC RX dispensed and billed for the same Fraudulent Compounded Pain Cream previously dispensed and billed by Health Choice Pharmacy, Inc. on May 27, 2016.  Copies of the duplicate prescriptions issued by Dr. James to Insured A.D. are annexed hereto at Exhibit "3" along with the corresponding bills.

- Insured D.T. was allegedly involved in a motor vehicle accident on September 15, 2016.  She sought treatment at a No-Fault clinic located at 9046 Corona Avenue, Elmhurst, NY. On October 5, 2016, she underwent an initial examination with Dr. James of Life Circles.  Dr. James did not recommend the Insured receive any prescription medications at the time of his initial examination.  Nevertheless, on October 17, 2016, Health Choice Pharmacy, Inc. dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. James on October 5, 2016. This prescription did not include refills. On November 9, 2016, Health Choice Pharmacy, Inc. dispensed and billed for another Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. James on October 26, 2016.  On December 5, 2016, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to **the same exact prescription** issued by Dr. James on October 5, 2016 and previously dispensed and billed for by Health Choice Pharmacy, Inc. on October 17, 2016.  Copies of the duplicate prescriptions issued by Dr. James to Insured D.T. are annexed hereto at Exhibit "4" along with the corresponding bills.

- Insured P.E. was allegedly involved in a motor vehicle accident on January 18, 2018.  He sought treatment at a No-Fault Clinic located at 1100 Pelham Parkway, Bronx, NY, and underwent an initial examination with NP Katushia of Metro Pain on January 22, 2018.  Upon initial examination, NP Katushia recommended the

Insured receive prescriptions for naproxen and Lidocaine 5% Ointment. It does not appear that these prescriptions were ever issued or filled. On March 5, 2018, NP Katushia performed a follow-up examination on the Insured and recommended he receive prescriptions for naproxen and Diclofenac Gel 3%. On March 21, 2018, HC RX dispensed and billed for naproxen and Lidocaine 5% Ointment pursuant to prescriptions allegedly issued by NP Katushia on March 8, 2018. HC RX *dispensed and billed the wrong medication*. The prescriptions NP Katushia issued on March 8, 2018, and that HC RX submitted to GEICO in support of its charges, were for naproxen and Diclofenac Gel 3%, not Lidocaine 5% Ointment. Moreover, on March 22, 2018, HC RX re-dispensed and re-billed for naproxen and dispensed and billed for Diclofenac Gel 3%. In support of its changes HC RX submitted **the same exact prescriptions** which were issued by NP Katushia on March 8, 2018 and submitted by HC RX on March 21, 2018 in support of its charges for naproxen and Lidocaine 5% Ointment. Copies of the duplicate prescriptions for Insured P.E are annexed hereto at Exhibit "5" along with the corresponding bills.

97.    Not only are these practices part of a fraudulent scheme designed to maximize profit, but they also pose a risk to – and show a genuine disregard for – patient health and safety as they constitute therapeutic duplication and increase the risk of adverse drug reactions to the patients subjected to them.

### 1.    The Fraudulent Compounded Pain Creams

98.    As part of their fraudulent, profit-driven scheme, the Defendants submitted or cause to be submitted, millions of dollars in claims for medically unnecessary, ineffective Fraudulent Compounded Pain Creams.

99.    Compounded products are not FDA-approved, and therefore, not subject to FDA regulations regarding quality, safety, and effectiveness of manufactured drug products.

100.    Because compounded products are not FDA-approved, they should never be prescribed as a matter of routine therapy, and should only be prescribed to meet a legitimate specific need of an individual patient, or when all other forms of oral and/or topical medications approved for the treatment of pain have failed.

101.    Prior to receiving a prescription for any compounded drug product, a patient's medical records should document all other forms of FDA-approved drugs that were prescribed and

24

failed to treat the symptom for which the compounded drug product was then prescribed, and/or the medical rationale that supports the otherwise premature prescription of a compounded drug product.

102.    From December 2015 through December 2017, HC RX dispensed and billed for Fraudulent Compounded Pain Creams, which are not approved by the FDA, in set formulations, without tailoring the medications to the individual needs of any individual patient, and without complying with licensing requirements that are designed to ensure the quality, safety and effectiveness of bulk compounded drug products.

103.    HC RX, in order to generate profits, intentionally produced and dispensed the Fraudulent Compounded Pain Creams without regard for the absence of any proven topical efficacy of the combination of ingredients.

104.    The Defendants submitted exorbitant charges for the Fraudulent Compounded Pain Creams knowing that the topical efficacy of the products HC RX produced and dispensed was unproven, and that there was a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost.

105.    The Defendants knew that there was no legitimate medical need for the Fraudulent Compounded Pain Creams that could explain why a commercially available drug product alone would not be appropriate for the patients who were instead prescribed and dispensed the exorbitantly-priced Fraudulent Compounded Pain Creams, often in addition to such commercially available products.

106.    The Defendants, solely to maximize profits, used HC RX to specialize in illegal compounding, producing large quantities of compounded drugs in set formulations, to compound and dispense specially marked, formulaic prescriptions.

107.    The Defendants then entered into collusive arrangement with the Clinic Controllers and Prescribing Providers in which they provided them with kickbacks or other financial incentives in exchange for fraudulent, illusory prescriptions for the Fraudulent Compounded Pain Creams.

108.    Notwithstanding the Defendants' attempt to conceal the scheme and present HC RX as a neighborhood pharmacy, the Defendants directly violated New York State and Federal regulatory and licensing requirements that govern large-scale drug compounders, drug manufacturers and outsourcing facilities and which prohibit collusive arrangements for compounding and/or dispensing of coded or specially marked prescriptions.

109.    The Fraudulent Compounded Pain Creams produced and dispensed by HC RX: (i) were not medically necessary; (ii) contained a combination of ingredients that was nonsensical and had no proven efficacy, or that produced no significant difference between the compounded drug and comparable commercially available products; (iii) were almost never prescribed properly under the governing regulations; and (iv) were "prescribed" and produced in large quantities without regard for medical necessity or the regulations governing the appropriate use of compounded drug products, as part of collusive arrangements with the Prescribing Providers and Clinic Controllers.

110.    In short, the Fraudulent Compounded Pain Creams produced by HC RX, and prescribed by the Prescribing Providers, served no purpose other than to exploit Insureds' No-Fault Benefits in order to financially benefit the Defendants.

      2.    **HC RX Specialized in Large Scale Drug Compounding Activity in Violation of New York State and Federal Law Governing Drug Manufacturers and Outsourcing Facilities**

111.    As stated above, in order to facilitate the prescription of the Fraudulent Compounded Pain Creams, and to steer the Prescribing Providers and Clinic Controllers to direct

those prescriptions to HC RX, the Defendants often provided the Prescribing Providers and Clinic Controllers with preset labels or rubber stamps which contained the names of the Fraudulent Compounded Pain Creams and the designated formulations, including the names of the particular drug ingredients and percentage concentrations of each ingredient used. The Prescribing Providers then used these stamps or labels on their official New York State prescription pads to prescribe the Fraudulent Compounded Pain Creams to the Insureds.

112.    For example, as shown on Defendants' billing submissions to GEICO, the Defendants produced and dispensed, among others, the following predetermined, formulaic, coded Fraudulent Compounded Pain Creams:

- "CP3 Cream" (also coded as "Compound RX 218N") containing the following ingredients in the following quantities:

  - KETOPROFEN 20 GRAMS
  - BACLOFEN 2 GRAMS
  - LIDOCAINE 2.5 GRAMS
  - CYCLOBENZAPRINE 2 GRAMS
  - IBUPROFEN 20 GRAMS
  - GABAPENTIN 6 GRAMS

- "CP7" containing the following ingredients in the following quantities:

  - KETOPROFEN 20%
  - BACLOFEN 2%
  - CYCLOBENZAPRINE 2%
  - GABAPENTIN 6%
  - LIDOCAINE 2.5%

- "CP9" containing the following ingredients in the following quantities:

  - DICLOFENAC 3%
  - BACLOFEN 2%
  - CYCLOBENZAPRINE 2%
  - GABAPENTIN 6%
  - LIDOCAINE 4%

- "CP11 Cream" (also coded as "Musculoskeletal Pan Cream") containing the following ingredients in the following quantities:

- CYCLOBENZAPRINE 2%
- FLURBIPROFEN 10%
- METHOCARBAMOL 5%
- VERAPAMIL 4%
- PENTOXIFYLLINE 5%
- TETRACAINE 4%

- "CP13 Cream" (also coded as "CP13A Cream") containing the following ingredients in the following quantities:

  - DICLOFENAC 3%
  - LIDOCAINE 2%
  - BACLOFEN 2%
  - CYCLOBENZAPRINE 2%
  - GABAPENTIN 6%
  - MENTHOL 5%

- "CP15" (also coded as DCLTM") containing the following ingredients in the following quantities:

  - DICLOFENAC 10%
  - CYCLOBENZAPRINE 3%
  - LIDOCAINE 5%
  - TETRACAINE 3%
  - MENTHOL 2%

- "ABCDLM Cream" containing the following ingredients in the following quantities:

  - AMITRIPTYLINE HCL 4%
  - BACLOFEN 3%
  - DICLOFENAC 10%
  - LIDOCAINE 5%
  - CYCLOBENZAPRINE 4%
  - MENTHOL 5%

113. The Defendants typically billed GEICO (i) between $962.50 and $2,259.86 for a single tube of "CP3"; (ii) between $958.61 and $1,955.19 for a single tube of "CP7"; (iii) between $1,695.90 and $1,741.17 for a single tube of "CP9"; (iv) between $1,580.91 and $1,588.71 for a single tube of "CP11"; (v) $1,568.48 for a single tube of "CP13"; (vi) between $1,059.81 and $1,141.for a single tube of "CP15"; and (vii) $1,377.05 for a single tube of "ABCDLM Cream".

114.    In addition to the coded Fraudulent Compounded Pain Creams identified above, HC RX often dispensed and billed for a Fraudulent Compounded Pain Cream which included baclofen, cyclobenzaprine, flurbiprofen, gabapentin, lidocaine, and menthol, and which typically resulted in charges to GEICO for $2,280.82 per tube, but at times exceeded $4,500.00 per tube.

115.    Despite the fact that, according to the FDA, traditional pharmacy compounding requires the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription, the preset prescription labels and rubber stamps – created by the Defendants and distributed to the Prescribing Providers and Clinic Controllers – indicate that the Defendants created predetermined compounded drug products and produced them in bulk.

116.    Additionally, by including both Ketoprofen and Ibuprofen -- two different NSAIDs -- in every preformulated tube of CP3 Cream, the Defendants engaged in therapeutic duplication whereby they unnecessarily increased the risk of adverse events to Insureds that purportedly received the Fraudulent Compounded Pain Cream.

117.    Similarly, by including both Baclofen and Cyclobenzaprene -- two different muscle relaxers -- in every preformulated tube of CP3 Cream, CP7, CP9, CP13, and ABCDLM Cream, the Defendants engaged in therapeutic duplication whereby they unnecessarily increased the risk of adverse events to Insureds that purportedly received the Fraudulent Compounded Pain Creams.

118.    The Fraudulent Compounded Pain Creams were not created or prescribed by the Prescribing Providers to meet the unique needs of any individual patient.

119.    Rather, the Fraudulent Compounded Pain Creams were produced and dispensed by HC RX in large quantities without regard for the unique needs of any individual patient.

120.    By supplying the Prescribing Providers and Clinic Controllers with the preset prescription labels and rubber stamps, the Defendants steered the Prescribing Providers and Clinic Controllers to prescribe, or caused to be prescribed, the Fraudulent Compounded Pain Creams in large volumes and direct those prescriptions to HC RX in exchange for kickbacks or other financial incentives.

121.    The Defendants never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that explained why a commercially available drug product was not appropriate to dispense to the Insureds who received the Fraudulent Compounded Pain Creams.

122.    Likewise, the Prescribing Providers never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that explained why a commercially available drug product was not appropriate to prescribe to the Insureds who received the Fraudulent Compounded Pain Creams.

123.    For example, the Prescribing Providers never indicated the patient had a contraindication to commercially available drug product or that the patient was failing to improve with the use of commercially available drug products, nor did they document any medication allergies or pre-existing comorbidity that may support the use of a Fraudulent Compounded Pain Cream.

124.    Accordingly, the Fraudulent Compounded Pain Creams, prescribed by the Prescribing Providers, and produced by the Defendants, were never customized for individual patients.   Rather the same Fraudulent Compounded Pain Creams were repeatedly prescribed and dispensed to hundreds of insureds.

125.    HC RX, by specializing in creating and dispensing large volumes of the Fraudulent Compounded Pain Creams, engaged in bulk compounding activity (akin to that engaged in by drug

manufacturers and outsourcing facilities) as opposed to compounding individual prescriptions on a case-by-case basis upon receipt of a valid prescription order.

126.    In the two years that HC RX illegally operated as a drug manufacturer of compounded pain creams, it billed GEICO alone in excess of $1,025,200.00 for the Fraudulent Compounded Pain Creams it created, produced and dispensed pursuant to the duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers.

127.    GEICO makes up only a fraction of the New York automobile insurance market, therefore, HC RX likely billed all New York automobile insurers more than three times the amount billed to GEICO.

128.    Accordingly, since its inception in December 2015, HC RX likely produced and dispensed massive volumes of the Fraudulent Compounded Pain Creams to patients resulting in millions and millions of dollars in claims submitted to various insurers.

129.    The Defendants' creation and dispensation of predetermined, compounded drug products in large volumes, renders HC RX in violation of both state and federal licensing laws regulating the safe manufacturing of drugs. See 21 U.S.C. § 355 and 21 U.S.C. 353a(a).

130.    Furthermore, by acting akin to drug manufacturers and dispensers, the Defendants violated 21 U.S.C. § 355(a) which states that "no person shall introduce or deliver for introduction into interstate commerce any new drug" without first obtaining approval to do so by way of an application filed with the Secretary with respect to that drug.

131.    A "new drug" – as defined by 21 U.S.C. § 321(p)(1) – is "any drug…the composition of which is such that such drug is not generally recognized…as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof."

132.    HC RX's Fraudulent Compounded Pain Creams – for which it billed GEICO alone over a million dollars – were never FDA-approved and, therefore, were never verified by the FDA as being safe, effective or quality products.

**3.    The Prescription and Dispensation of HC RX's Fraudulent Compounded Pain Creams Was Contrary to Evidenced-Based Medical Practices.**

133.    In keeping with the fact that the Fraudulent Compounded Pain Creams were prescribed pursuant to the Defendants' fraudulent scheme intended to generate profits from insurers, HC RX's Fraudulent Compounded Pain Creams (i) have no medical efficacy based on the purported symptoms of the patients receiving the compounded products, and (ii) were prescribed without any legitimate reason to provide the patients with expensive compounded products – which include drugs whose efficacy in topical form is undocumented and unsupported – when there are many other widely accepted, proven effective alternatives with well-documented therapeutic benefits commercially available at considerably lower costs.

134.    Topical compounded pain creams should be the last prescribed intervention, after oral medications are not tolerated or are deemed ineffective or contraindicated, as well as after any FDA-approved manufactured topical products have been shown to provide no pain relief to the patient.

135.    For a topical formulation to be effective, it must first penetrate the skin.  In general, creams are less effective than gels or sprays.

136.    The skin is composed of three layers: epidermis, dermis, and hypodermis.  Within the epidermis, the stratus corneum is the outermost layer of the skin that serves as the main barrier to drug entry.  For analgesic medicines to be absorbed through the skin, they must contain optimal

drug combinations, effective concentrations of each drug, and a compounding base with the appropriate physiochemical properties to facilitate absorption.

137.    For a drug to alleviate pain, it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

138.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated – those with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease or congestive heart failure).

139.    HC RX's Fraudulent Compounded Pain Creams contain combinations of drugs that make no clinical sense and have no efficacious value in treating musculoskeletal and neuropathic injuries – even assuming the Insureds the Prescribing Providers treated suffered from such injuries.

140.    There are no published, peer-reviewed, controlled studies to support that patients who suffer from musculoskeletal pain or neuropathy have achieved any therapeutic effect from using topical pain creams containing the drugs that are part of the Fraudulent Compounded Pain Creams.

141.    Further, many of the Fraudulent Compounded Pain Creams are available in alternative oral formulations or are commercially available in different topical formulations for a fraction of the cost.

142.    The alternatives to the Fraudulent Compounded Pain Creams, whether in oral formulations or commercially available topical formulations, have proven to therapeutically

benefit patients suffering from pain, are FDA-approved, and are commonly prescribed by healthcare providers who utilize evidence-based medicine for their prescribing practices.

143.    Contrary to evidenced-based medical practices, in exchange for kickbacks or other financial incentives, the Prescribing Providers routinely prescribed the Fraudulent Compounded Pain Creams without regard to whether other forms of oral and/or topical medications approved for the treatment of pain failed, or whether there was a contraindication for their use.

144.    The Prescribing Providers failed to practice evidence-based medicine.  Rather, the Prescribing Providers prescribed the Fraudulent Compounded Pain Creams based on their illegal, collusive arrangements with the Defendants who employed a fraudulent, predetermined treatment and billing protocol designed to financially exploit Insureds by causing the Prescribing Providers and Clinic Controllers to steer prescriptions for the Fraudulent Compounded Pain Creams to HC RX in exchange for kickbacks or other financial incentives.

145.    The Prescribing Providers failed to recommend that the Insureds try over-the-counter or prescription FDA-approved topical medications and to assess their effectiveness, prior to prescribing one of the Fraudulent Compounded Pain Creams mass produced and dispensed by the Defendants.

146.    The Prescribing Providers also continuously failed to document in their examination reports whether the patients were intolerant of commercially available products, or whether any commercially available products were recommended to the patient but failed.

147.    The Prescribing Providers also continuously failed to document in their examination reports why any compounded drug product was medically necessary, or why the Fraudulent Compounded Pain Cream they ultimately prescribed for the patient was medically necessary.

148.    Specifically, although compounded drugs should not be prescribed as a matter of routine therapy, but rather should only be prescribed when there is a legitimate need for a uniquely tailored medication or there is documented evidence that all other forms of oral and/or topical medications approved for the treatment of pain have failed, the Prescribing Providers and Clinic Controllers routinely prescribed, or caused to be prescribed, a Fraudulent Compounded Pain Cream upon initial examination. For example:

- Insured U.D. was allegedly involved in a motor vehicle accident on January 1, 2017.  He sought treatment at a No-Fault Clinic located at 4014A Boston Road, Bronx, NY, and on January 12, 2017 underwent an initial examination with Jean Pierre Georges Barakat, M.D. ("Dr. Barakat") of Bronx County Medical Care, P.C. ("Bronx County Medical"). At the time of the initial examination, Dr. Barakat did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on January 27, 2017, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Barakat upon initial examination on January 12, 2017. On March 16, 2017, HC RX dispensed and billed for another Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Barakat on March 3, 2017 following a re-examination of the Insured.  Notably, none of the examinations of the Insured performed by Bronx County Medical prior to Dr. Barakat's March 3, 2017 prescription indicate a legitimate need for a uniquely tailored compounded medication, or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured D.S. was allegedly involved in a motor vehicle accident on August 16, 2016.  She sought treatment at a No-Fault Clinic located at 550 Remsen Avenue, Brooklyn, NY, and on August 25, 2016 underwent an initial examination with Marc Rosenblatt, D.O. ("Dr. Rosenblatt") of Urban Medical, P.C. ("Urban Medical"). At the time of the initial examination, Dr. Rosenblatt did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August 31, 2016, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Rosenblatt upon initial examination on August 25, 2016.

- Insured A.H. was allegedly involved in a motor vehicle accident on October 28, 2016.  She sought treatment at a No-Fault Clinic located at 139 N Central Avenue, Valley Stream, NY, and on November 2, 2016 underwent an initial examination with Seo Han, M.D. ("Dr. Han"). At the time of the initial examination, Dr. Han did not document that the Insured had a legitimate need for a uniquely tailored

compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on November 29, 2016, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Han upon initial examination on November 2, 2016 and which allowed for one refill.

- Insured F.C. was allegedly involved in a motor vehicle accident on January 30, 2017.  He sought treatment at a No-Fault Clinic located at 4014A Boston Road, Bronx, NY, and on January 31, 2017 underwent an initial examination with Dr. Barakat of Bronx County Medical. At the time of the initial examination, Dr. Barakat did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on February 8, 2017, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Barakat upon initial examination on January 31, 2017. On March 20, 2017, HC RX dispensed and billed for another Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Barakat on March 3, 2017 following a re-examination of the Insured.  Notably, none of the examinations of the Insured performed by Bronx County Medical prior to Dr. Barakat's March 3, 2017 prescription indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured N.C. was allegedly involved in a motor vehicle accident on March 27, 2016. He sought treatment at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, NY, and on April 6, 2016 underwent an initial examination with Timothy Morley, M.D. ("Dr. Morley") of TJM Medical, P.C. ("TJM Medical"). At the time of the initial examination, Dr. Morley did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on April 13, 2016, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Morley upon initial examination on April 6, 2016. On May 12, 2016, HC RX dispensed and billed for another Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Morley on May 4, 2016 following a re-examination of the Insured. Notably, none of the examinations of the Insured performed by TJM Medical prior to Dr. Morley's May 4, 2016 prescription indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured D.C. was allegedly involved in a motor vehicle accident on January 20, 2017.  She sought treatment at a No-Fault Clinic located at 665 Pelham Parkway, Bronx, NY, and on February 6, 2017 underwent an initial examination with David Lifschutz, M.D. ("Dr. Lifschutz") of Integrated Neurological Associates, PLLC ("Integrated Neurological"). At the time of the initial examination, Dr. Lifschutz did not document that the Insured had a legitimate need for a uniquely tailored

compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on February 13, 2017, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Lifschutz upon initial examination on February 6, 2017.

- Insured K.D. was allegedly involved in a motor vehicle accident on July 29, 2016. She sought treatment at a No-Fault Clinic located at 107-48 Guy Brewer Boulevard, Jamaica, NY, and on August 2, 2016 underwent an initial examination with Dr. Rosenblatt of Urban Medical. At the time of the initial examination, Dr. Rosenblatt did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August 9, 2016, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Rosenblatt upon initial examination on August 2, 2016. Notably, the Fraudulent Compounded Pain Cream prescribed by Dr. Rosenblatt contained diclofenac sodium.  The Insured's medical history – as detailed by the Insured's hospital records as opposed to Dr. Rosenblatt's examination – includes, among others, serious heart conditions such as cardiomyopathy, ventricular tachycardia and the use of a defibrillator, all of which are contraindications to the use of diclofenac sodium and place the Insured at increased risk of adverse events.

- Insured N.D. was allegedly involved in a motor vehicle accident on August 10, 2016.  He sought treatment at a No-Fault Clinic located 86-10 101 Avenue, Ozone Park, NY, and on August 23, 2016 underwent an initial examination with Urban Medical performed Dr. Rosenblatt's physician assistant, Michael Katz, P.A. ("PA Katz"). At the time of the initial examination, PA Katz did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August 29, 2016, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Rosenblatt upon initial examination on August 23, 2016.

- Insured E.P. was allegedly involved in a motor vehicle accident on December 29, 2016.  He sought treatment at a No-Fault Clinic located at 4014A Boston Road, Bronx, NY, and on January 3, 2017 underwent an initial examination with Dr. Barakat of Bronx County Medical. At the time of the initial examination, Dr. Barakat did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on January 25, 2017, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Barakat upon initial examination on January 3, 2017.

- Insured R.G. was allegedly involved in a motor vehicle accident on July 24, 2016. He sought treatment at a No-Fault Clinic located at 2488 Grand Concourse, Bronx, NY, and on August 2, 2016 underwent an initial examination with Dr. Morley of

TJM Medical. At the time of the initial examination, Dr. Morley did not document that the Insured had a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. Nevertheless, on August 18, 2016, HC RX dispensed and billed for a Fraudulent Compounded Pain Cream pursuant to a prescription issued by Dr. Morley upon initial examination on August 2, 2016.

149.    The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Cream prescribed to a particular patient was actually used by the patient.

150.    The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Cream provided any pain relief to the patient or was otherwise effective for the purpose prescribed.

151.    At times, the Prescribing Providers failed to document in any of their examination reports that the patient even received a Fraudulent Compounded Pain Cream, or documented a different Fraudulent Compounded Pain Cream than what was actually prescribed to the patient, and dispensed and billed by the Defendants.

152.    The Prescribing Providers plainly and continuously failed to prescribe individually tailored compounded products, made for an identified individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available FDA-approved product.

153.    Likewise, HC RX never dispensed individually tailored compounded products, made for an identified individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available product.

154.    The combination of drugs used in the Fraudulent Compounded Pain Creams was merely a means for the Defendants to inflate their billing and maximize their charges to exploit New York automobile insurance carriers, as pharmacy providers are ordinarily statutorily

reimbursed for each individual ingredient contained in a compounded drug product. As a result, the more drug ingredients that HC RX included in its Fraudulent Compounded Pain Creams, the more the Defendants could bill under the name of HC RX.

### 4. The Fraudulent Diclofenac Gel and Lidocaine Ointment Prescriptions

155.    In accordance with the fraudulent scheme discussed above, once HC RX ceased its illegal operation as a manufacturer of the Fraudulent Compounded Pain Creams, it primarily and routinely billed GEICO for exorbitantly priced Non-Compounded Fraudulent Topical Pain Products primarily in the form of Diclofenac Sodium Gel and Solutions ("Topical Diclofenac") and Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

156.    Topical Diclofenac is an NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet. It has not been proven effective for treating strains or sprains.

157.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

158.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

159.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

160.    Notwithstanding the most common uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as celecoxib (or its brand name equivalent, Celebrex), meloxicam, ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals including additional Fraudulent Topical Pain Products.

161.    Prescribing Topical Diclofenac, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

162.    Nevertheless, Prescribing Providers consciously prescribed and the Pharmacy Defendants consciously dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or Fraudulent Topical Pain Products to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.  For example:

- Insured J.B. was allegedly involved in a motor vehicle accident on July 8, 2017. He sought treatment at a No-Fault Clinic located at 3209 Fulton Avenue, Brooklyn, NY, and underwent an initial examination with Harold James, M.D. ("Dr. James") of Channel Medical, P.C. ("Channel Medical") on July 11, 2017.  Upon initial examination, Dr. James issued prescriptions for Celebrex (celecoxib) and Diclofenac Gel 3%. These prescriptions were dispensed and billed by HC RX on July 14, 2017. On September 8, 2017, HC RX dispensed and billed for Lidocaine 5% Patches pursuant to a prescription issued by Olakunle Oluwole, M.D. ("Dr. Oluwole") of Metro Pain Specialist, P.C. ("Metro Pain") on August 31, 2017. GEICO has no record of Dr. Oluwole examining the Insured on or about August 31, 2017.  On January 16, 2018, HC RX dispensed and billed for Naproxen and Diclofenac Gel 3% pursuant to prescriptions allegedly issued by Paul Katushia, N.P. ("NP Katushia") of Metro Pain on December 27, 2017. *HC RX dispensed and billed the wrong medication*.  Specifically, the prescriptions NP Katushia issued on December 27, 2017, and that HC RX submitted to GEICO in support of its charges, were for Naproxen and Lidocaine 5% Ointment, not Diclofenac Gel 3%.

- Insured G.D. was allegedly involved in a motor vehicle accident on April 10, 2018. He sought treatment at a No-Fault Clinic located at 1100 Pelham Parkway, Bronx, NY, and underwent an initial examination with Theodros Seyoum, M.D. ("Dr.

Seyoum") of Metro Pain on April 18, 2018. Upon initial examination, Dr. Seyoum issued prescriptions for cyclobenzaprine, Lidocaine 5% Patches, Diclofenac Gel 3%, and naproxen. These prescriptions were dispensed and billed by HC RX on April 27, 2018.

- Insured R.B. was allegedly involved in a motor vehicle accident on May 19, 2018. He sought treatment at a No-Fault Clinic located at 655 Pelham Parkway, Bronx, NY, and underwent an initial examination with Mary Perdue, M.D. ("Dr. Perdue") of Metropolitan Medical and Surgical, P.C. ("Metropolitan Medical") on June 4, 2018. Upon initial examination, Dr. Perdue issued prescriptions for Diclofenac Gel 3% and meloxicam. These prescriptions were dispensed and billed by HC RX on June 7, 2018.

- Insured S.L. was allegedly involved in a motor vehicle accident on September 24, 2018. She sought treatment at a No-Fault clinic located at 219-16 Linden Boulevard, Cambria Heights, NY, and underwent an initial examination with Gamil Kostandy, M.D. ("Dr. Kostandy") of New Era Medical, P.C. ("New Era Medical") on October 3, 2019. Notably, Dr. Kostandy documented in his report that the patient was pregnant at the time of the examination and his treatment plan specifically states that no medications should be prescribed due to her pregnancy. Nevertheless, on October 11, 2018, HC RX dispensed and billed for Lidocaine 5% Ointment and Diclofenac Gel 3% pursuant to prescriptions allegedly issued by Dr. Kostandy on October 7, 2018. There is no indication that the patient consulted with her obstetrician, or that she was advised to do so, prior to receiving the Fraudulent Topical Pain Products.

- Insured E.E. was allegedly involved in a motor vehicle accident on April 16, 2018. He sought treatment at a No-Fault Clinic located at 3040 Nostrand Avenue, Brooklyn, NY, and underwent an initial examination with Pauline Raitses, D.O. ("Dr. Raitses") of Midwood Metropolitan Medical, P.C. ("Midwood Medical") on April 17, 2018. Upon initial examination, Dr. Raitses issued prescriptions for Diclofenac Gel 3% and naproxen. These prescriptions were dispensed and billed by HC RX on April 23, 2018. HC RX also dispensed and billed for Terocin lotion on May 24, 2018 pursuant to a prescription issued by Dr. Raitses following a re-examination of the Insured on May 17, 2018.

- Insured J.U. was allegedly involved in a motor vehicle accident on April 16, 2018. He sought treatment at a No-Fault Clinic located at 3040 Nostrand Avenue, Brooklyn, NY, and underwent an initial examination with Dr. Raitses of Midwood Medical on April 17, 2018. Upon initial examination, Dr. Raitses issued prescriptions for Diclofenac Gel 3% and naproxen. These prescriptions were dispensed and billed by HC RX on May 2, 2018.

- Insured A.C. was allegedly involved in a motor vehicle accident on February 17, 2018. He sought treatment at a No-Fault Clinic located at 1100 Pelham Parkway, Bronx, NY, and underwent an initial examination with Dr. Seyoum of Metro Pain

on February 21, 2018. Upon initial examination, Dr. Seyoum recommended the patient receive prescriptions for Flexeril (cyclobenzaprine), naproxen and Lidoderm (lidocaine) 5% Patches. It does not appear that these prescriptions were ever issued and filled.  On March 28, 2018, Dr. Seyoum performed a follow-up examination on the Insured and recommended he receive prescriptions for Flexeril (cyclobenzaprine) and Lidoderm (lidocaine) 5% Patches.  On April 4, 2018, HC RX dispensed and billed for cyclobenzaprine, Lidocaine 5% Patches *and* Diclofenac Gel 3% (*which was not documented in Dr. Seyoum's treatment recommendation*) pursuant to prescriptions issued by Dr. Seyoum on March 28, 2018.

- Insured D.C. was allegedly involved in a motor vehicle accident on May 20, 2018. He sought treatment at a No-Fault Clinic located at 655 Pelham Parkway, Bronx, NY, and underwent an initial examination with Dr. Perdue of Metropolitan Medical on May 21, 2018. Upon initial examination, Dr. Perdue issued prescriptions for Diclofenac Gel 3% and meloxicam. These prescriptions were dispensed and billed by HC RX on May 22, 2018.

- Insured S.C. as allegedly involved in the same motor vehicle accident as Insured D.C., supra, on May 20, 2018.  Like D.C., Insured S.C. sought treatment at a No-Fault Clinic located at 655 Pelham Parkway, Bronx, NY, and underwent an initial examination with Dr. Perdue of Metropolitan Medical on May 21, 2018. As with D.C., upon initial examination of S.C. Dr. Perdue issued prescriptions for meloxicam and Diclofenac Gel 3%. These prescriptions were dispensed and billed by HC RX on May 22, 2018 and May 25, 2018, respectively.

- Insured K.D. was allegedly involved in a motor vehicle accident on May 8, 2018. He sought treatment at a No-Fault Clinic located at 655 Pelham Parkway, Bronx, NY, and underwent an initial examination with Dr. Perdue of Metropolitan Medical on May 14, 2018. Upon initial examination, Dr. Perdue issued prescriptions for Diclofenac Gel 3% and meloxicam. These prescriptions were dispensed and billed by HC RX on May 22, 2018.

163.    In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed diclofenac sodium.

164.    In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the

follow-up examination reports performed by the Prescribing Providers virtually never addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

165.    The Defendants almost exclusively dispensed and billed for Topical Diclofenac in the form of Diclofenac Gel 3%, typically billing between $1,179.46 and $2,358.92 for a single tube of gel. The Defendants' total billing submitted through HC RX to GEICO for Topical Diclofenac exceeds $702,500.00.

166.    Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services recently issued a report which noted that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium because, among other reasons, there is a striking difference between the cost of a compounded topical containing diclofenac sodium and a non-compounded version of the same drug. In that same report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

167.    In addition to the egregious number of Topical Diclofenac prescriptions dispensed by the Defendants, the Defendants routinely billed GEICO for exorbitantly priced topical Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other incentives.

168.    Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such

as sutures or injections. Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

169.    Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter lidocaine ointments or lotions to treat their minor aches and pains which they sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers and Clinic Controllers routinely prescribed to Insureds, or caused the prescription of, Lidocaine 5% Ointment and directed the prescriptions to HC RX.

170.    Further, to the extent that topical lidocaine ointment is effective for treating certain specific conditions, the Lidocaine 5% Ointment dispensed by the Defendants is only marginally stronger or more effective than OTC 4% lidocaine yet costs exponentially more. Rather than provide more conservative, cost-effective treatment, the Prescribing Providers, at the direction of the Defendants, virtually never directed the Insureds to try OTC 4% lidocaine prior to prescribing the Lidocaine 5% Ointment, in order to exploit the Insureds for financial gain.

171.    For example,  the Prescribing Providers never recommended insureds first try Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available in a 2.7 oz. tube at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices around $10.00.

172.    The initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescription of Lidocaine 5% Ointment and, in some cases, failed to acknowledge that the patient was prescribed Lidocaine 5% Ointment.

173.    Likewise, the follow-up examination reports by the Prescribing Providers virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the

patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

174.    To-date, the Defendants, through HC RX, have submitted more than $230,100.00 in fraudulent claims to GEICO seeking reimbursement for of Lidocaine 5% Ointment, typically billing $1,523.72 for a single tube of ointment.

175.    The Defendants' egregious billing coupled with the fact that the Prescribing Providers failed to properly document – or even document at all – the prescriptions for Topical Diclofenac and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds, particularly given the potential for adverse health effects.

### 5.    The Fraudulent Pain Patch Prescriptions

176.    As a further part of the scheme, the Defendants routinely billed GEICO for exorbitantly priced pain patches primarily in the form of Medi-Patches with Lidocaine ("Medi-Patches") and Terocin 4% Patches ("Terocin Patches") (together, the "Fraudulent Pain Patches"), pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other incentives.

177.    In keeping with the fact that the Defendants steered the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Fraudulent Pain Patches were routinely dispensed and billed at exorbitant prices despite the fact that there are other, less expensive, commercially available FDA-approved patches available.

178.    The Defendants typically submitted charges to GEICO ranging from $1,128.64 to $2,499.78 for dispensing a single prescription of Terocin Patches.

179.    Notably, Terocin Patches are available for purchase over-the-counter without a prescription at a fraction of that price.

180.    Additionally, in addition to menthol, the primary ingredient in Terocin Patches is lidocaine which itself is available in an FDA approved patch for a fraction of the cost. In fact, the Defendants dispensed and billed for Lidocaine 5% Patches at charges ranging from $280.81 to $498.23 per prescription. To-date, the Defendants, through HC RX, have submitted more than $400,100.00 in fraudulent claims to GEICO seeking reimbursement for Terocin Patches.

181.    Likewise, the Defendants typically billed GEICO $2,640.00 for dispensing a single prescription for Medi-Patches. Like Terocin Patches, the primary ingredient in Medi-Patches is lidocaine. To-date, the Defendants, through HC RX, have submitted more than $138,600.00 in fraudulent claims to GEICPP for Medi-Patches.

182.    Topical pain patches in which the primary ingredient is lidocaine (i.e., the Fraudulent Pain Patches) are mainly used to treat *chronic post-herpetic neuropathic* pain, although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of the patches themselves.

183.    While application of pain patches with a primary ingredient of lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

184.    Nevertheless, the Prescribing Providers routinely prescribed the Fraudulent Pain Patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

185.    The Fraudulent Pain Patches were routinely prescribed at the time of the initial examination – during the acute stages of the Insureds' pain symptoms.

186.    Like the prescriptions for Lidocaine 5% Ointment, the Prescribing Providers never recommended Insureds first use over-the-counter patches containing lidocaine – which are available to treat their often acute, minor strain/sprain injuries. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds Terocin Patches and Medi-Patches.

187.    As with the prescriptions for the other Fraudulent Topical Pain Products, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescription of a Fraudulent Pain Patch, and – in some cases – failed to acknowledge that the patient was even prescribed a Fraudulent Pain Patch.

188.    Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Pain Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

189.    In keeping with the fact that the Defendants acted with gross indifference to patient care and safety, the patients were generally not instructed on the safe use, side effects or risks associated with the Fraudulent Pain Patches.

190.    Notably, the Defendants' total billing submitted through HC RX to GEICO for Fraudulent Pain Patches exceeds $585,400.00.

**C.    The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among HC RX, the Prescribing Providers and the Clinic Controllers**

191.    To effectuate the fraudulent scheme, pursuant to the collusive arrangements among them, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to HC RX for large volumes of the Fraudulent Topical Pain Products – without regard to genuine patient care and in violation of New York law – which egregiously inflated the charges submitted to GEICO.

192.    New York's statutory framework provides, among other things, that physicians and physician's assistants are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

193.    New York's statutory framework also specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See N.Y. Education Law § 6530(38) and § 6811(7).  In fact, New York Education Law § 6811(7) makes such agreements criminal.

194.    Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and direct those prescriptions to HC RX so that the Defendants could bill GEICO huge sums.

195.    In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to

genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

196.    The Defendants supplied preset labels or rubber-stamps to the Prescribing Providers and Clinic Controllers to steer the Prescribing Providers to use the stamps or labels on their New York State prescription forms and prescribe the Fraudulent Pharmaceuticals, including the Fraudulent Compounded Pain Creams produced by HC RX.

197.    The purpose of the Defendants supplying the Prescribing Providers and Clinic Controllers with the preset stamps and labels was so that the Prescribing Providers may repeatedly issue predetermined and/or medically unnecessary and formulaic prescriptions for the expensive Fraudulent Pharmaceuticals that HC RX "specialized" in dispensing, including the Fraudulent Compounded Pain Creams they produced, in order to exploit the patients' No-Fault Benefits.

198.    The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; that the Fraudulent Compounded Pain Creams were not customized or tailored to the individual needs of a particular patient; the Fraudulent Pharmaceuticals were often prescribed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed with gross indifference to patient health, care and safety; the Fraudulent Pharmaceuticals were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and the Fraudulent Pharmaceuticals were prescribed without attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

199.    The Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy of their own choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to HC RX, notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located in counties far from HC RX in Jamaica, Queens and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

200.    HC RX purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever receiving the actual written prescription and, in many cases, without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

201.    Alternatively, the Insureds were given the Fraudulent Pharmaceuticals by the front desk staff at the various No-Fault Clinics, again without ever seeing the actual prescription or, in many cases, not even knowing that they were to receive a Fraudulent Pharmaceutical.

202.    The Defendants, the Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their own choosing so as to ensure that the prescriptions were filled by HC RX and to ensure that the Defendants benefitted financially from the prescriptions.

203.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

204.    The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to HC RX rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

205.    The Defendants, the Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including using HC RX's preset rubber stamps and labels distributed by the Defendants, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to HC RX, unless they profited from their participation in the illegal scheme.

206.    But for the payments of kickbacks, or other financial incentives (such as employment at a No-Fault Clinic), the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, including the Fraudulent Compounded Pain Creams, and would not have directed the prescriptions to HC RX.

207.    The Defendants, Prescribing Providers, and Clinic Controllers have affirmatively concealed the amount of the kickbacks paid since such kickbacks are in violation of New York law.

208.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by HC RX.

209.    Upon information and belief, the payment of such kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**D.      The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

210.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of

the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

211.   Each NDC (and, thus, the AWP) for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

212.   The maximum amount a healthcare provider may charge for a medically necessary prescription drug or product is based upon the drug's NDC number. With respect to compounded products, the maximum a healthcare provider may charge is based on each individual ingredient included in the compounded product and their corresponding NDC numbers and AWPs.

213.   Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

214.   For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

215.   AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> "[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee."

216.   When a pharmacist bills for dispensing prescription drugs (including compounded products), it must bill based on the actual NDC number (and the assigned AWP) for that drug or

compound drug ingredient.  It cannot use the NDC of the same ingredient available from a different supplier and/or purchased in different quantities in order to inflate the assigned AWP.

217.    The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the pre-determined, formulaic Fraudulent Compounded Pain Creams because the more ingredients contained in a compounded drug product, the more charges the Defendants may submit through HC RX for dispensing the product.

218.    The Defendants produced and dispensed the Fraudulent Compounded Pain Creams – which were produced in bulk by compounding multiple drug ingredients in nonsensical combinations with no proven efficacy – in order to inflate HC RX's billing and maximize their profits.

219.    Likewise, the Defendants solicited the Clinic Controllers and the Prescribing Providers to provided them with voluminous prescriptions for the Non-Compounded Fraudulent Topical Pain Products (i.e., Topical Diclofenac, Lidocaine 5% Ointment and the Fraudulent Pain Patches) because the Defendants could readily buy these Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

220.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate HC RX's billing and maximize their profits.

221.    The Defendants purported to provide the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, directly to GEICO Insureds, and sought reimbursement directly from GEICO pursuant to executed "Assignment of Benefit" ("AOB") forms.

222.    In support of their charges, the Defendants typically submitted: (i) the Prescribing Provider's prescription forms; (ii) a "No-Fault" form, known as an NF-3 Form, which includes the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) a delivery receipt which included the Insureds' demographics, the date the prescription was allegedly delivered, and the pharmaceutical product that was delivered and in what quantity; and (iv) the executed AOB assigning the Insureds' benefits to the Defendants.

223.    However, at times, in support of their charges, the Defendants only submitted a HCFA-1500 Form, which included the purported NDC numbers, units, and corresponding charges for each drug product dispensed.  In these instances, the Defendants never submitted a delivery receipt confirming the Insureds actually received the medications billed to GEICO, or an executed AOB demonstrating that the Insureds in fact assigned their rights to No-Fault Benefits to the Defendants, or any other supporting documentation whatsoever that allowed GEICO to identify from the billing submission alone what Fraudulent Pharmaceuticals were allegedly prescribed and dispensed in correlation with the NDC numbers listed on the HCFA-1500 Form.

224.    Moreover, the Defendants never submitted their wholesale purchase invoices demonstrating (i) how much the Defendants actually paid the supplier for the Fraudulent Pharmaceuticals, including the ingredients contained in the Fraudulent Compounded Pain Creams, and (ii) whether the Defendants actually purchased the Fraudulent Pharmaceuticals or the ingredients contained in the Fraudulent Compounded Pain Cream under the particular NDC numbers used in the billing, representing purchases from a particular supplier in a particular quantity.

225.    With respect to the Fraudulent Pharmaceuticals, HC RX never actually paid the "average wholesale price" of the products it dispensed or purported to dispense, and in particular

never paid the targeted and egregious average wholesale price for the Fraudulent Topical Pain Products, because it is not a true representation of actual market price and is far above the actual acquisition cost of the drug products themselves.

226.    Nevertheless, the Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing both their actual acquisition costs as well as the costs of a wide variety of other medications that are FDA-approved and proven effective.

## V.    The Defendants' Submission of Fraudulent NF-3 and HCFA-1500 Forms to GEICO

227.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of HC RX seeking payment for the pharmaceuticals for which it is ineligible to receive payment.

228.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

  i.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

  ii.    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to HC RX in exchange for unlawful kickbacks and other financial incentives;

iii.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, duplicitous and formulaic prescriptions;

iv.     The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

v.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing requirements in that they engaged in illegal bulk compounding by producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering HC RX ineligible to receive reimbursement for No-Fault Benefits.

## VI.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

229.     The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

230.     To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

231.     Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and

dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies; and (iii) the Defendants engaged in illegal bulk compounding by producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements.

232.    The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

233.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

234.    In accordance with the No-Fault Laws, GEICO either: (i) timely denied the pending claims for No-Fault Benefits submitted through HC RX; (ii) timely issued requests for additional verification with respect to the pending claims for No-Fault Benefits submitted through HC RX yet failed to obtain complete compliance with those requests; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through HC RX or to request additional verification of those claims, has not yet expired.

235.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that HC RX has been engaged in fraud.

236.    The Defendants' continued collection efforts through numerous, separate collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a no-fault arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceutical to hundreds of patients across numerous different No-Fault Clinics located throughout the New York metropolitan area.

237.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $385,400.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

238.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

239.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

240.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $1,364,000.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through HC RX.

241.    HC RX has no right to receive payment for any pending bills submitted to GEICO because HC RX billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

242.    HC RX has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to HC RX in exchange for unlawful kickbacks and other financial incentives.

243.    HC RX has no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by HC RX pursuant to the illegal, invalid, duplicitous, and formulaic prescriptions.

244.    HC RX has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products (that they acquired at low cost and had HC RX dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

245.    HC RX has no right to receive payments for any pending bills submitted to GEICO because the Defendants engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault Benefits.

246.    The Defendants, including HC RX, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

247.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that HC RX has no right to receive payment for any pending bills submitted to GEICO.

### THE SECOND CLAIM FOR RELIEF
**Against Akilov and Mosheyev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

248.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

249.    HC RX is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

250.    Akilov and Mosheyev knowingly conducted and/or participated, directly or indirectly, in the conduct of HC RX's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four and a half years, seeking payments that HC RX was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to HC RX in exchange for unlawful kickbacks and other financial incentives; (iii) the billed-for services were

the product of illegal, invalid, duplicitous and formulaic prescriptions; (iv) the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (v) HC RX engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault Benefits. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

251.   HC RX's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Akilov and Mosheyev operated HC RX, inasmuch as HC RX never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for HC RX to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through HC RX to the present day.

252.   HC RX is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals, including Fraudulent Compounded Pain Creams; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently

unlawful acts are taken by HC RX in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

253.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $385,400.00 pursuant to the fraudulent bills submitted by the Defendants through HC RX.

254.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THE THIRD CLAIM FOR RELIEF
### Against All Defendants
### (Common Law Fraud)

255.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

256.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of HC RX.

257.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that HC RX acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and

11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to HC RX in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that HC RX acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, duplicitous, and formulaic prescriptions; (iv) in every claim, the representation that HC RX acted in accordance with material licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds with inflated charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (v) in every claim, the representation that HC RX acted in accordance with materials licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact HC RX engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements.

258.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through HC RX that were not compensable under the No-Fault Laws.

259.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $385,400.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through HC RX.

260.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

261.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE FOURTH CLAIM FOR RELIEF
**Against All Defendants**
**(Unjust Enrichment)**

262.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

263.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

264.    When GEICO paid the bills and charges submitted by or on behalf of HC RX for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

265.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

266.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

267.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $385,400.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that HC RX has no right to receive payment for any pending bills, amounting to approximately $1,364,000.00 submitted to GEICO;

B.    On the Second Claim For Relief against Akilov and Mosheyev, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $385,400.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.    On the Third Claim for Relief against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $385,400.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

D.    On the Fourth Claim for Relief against the Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $385,400.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
        January 14, 2021

                        RIVKIN RADLER LLP


                        By:  */s/ Michael A. Sirignano*
                                Michael A. Sirignano (MS 5263)
                                Barry I. Levy (BL 2190)
                                Priscilla D. Kam (PK 1505)
                                Joshua D. Smith (JS 3989)
                        926 RXR Plaza
                        Uniondale, New York 11556
                        (516) 357-3000

                        *Counsel for Plaintiffs, Government Employees*
                        *Insurance Company, GEICO Indemnity Company,*
                        *GEICO General Insurance Company and GEICO*
                        *Casualty Company*